UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07CR 175 RWS |
| | ) | |
| LARRY JEAN BRIDGES, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

The defendant has filed his Motion to Suppress Evidence Obtained in Search or Seizure and Statements of the Defendant (Document #23). The government has filed its Response (Document #24).

Defendant urges in his motion that:

1. Any evidence seized was obtained in violation of his rights under the Fourth Amendment of the Constitution of the United States;

2. Any statements made by him were the product of an unlawful seizure, or were otherwise involuntary within the meaning of the Fifth Amendment of the Constitution of the United States, or were made while in custody in response to interrogation without having been advised of his rights under Miranda v. Arizona.

Not surprisingly, the government disagrees.

## Factual Background

On September 2, 2007, at approximately 9:32 p.m., Officer David Templeton of the

Cape Girardeau Police Department, while on patrol, received a police dispatch of a weapons violation at a Rhodes 101 Stop, a gas station and convenience store, located at 546 South Sprigg Street in Cape Girardeau, Missouri. While en route to the scene, he was advised that the suspect, a black male, had flourished a black handgun from a maroon van, with Missouri license plate starting with the numbers "54." Officer Templeton was advised that the suspect had left the Rhodes 101 Stop parking lot in a van and was traveling north on South Sprigg.

Just minutes later, Officer Bruce Blackman of the Cape Girardeau Police Department, also on patrol, was traveling east on Independence Street when he advised that he saw a van matching the description of the subject vehicle traveling north on Sprigg Street, near the intersection of Sprigg and Independence Streets. He had heard the earlier dispatch on his radio. Officer Templeton turned south onto Sprigg from Broadway and, facing the subject vehicle, turned on his emergency lights and initiated a traffic stop of the van. The vehicle was identified as a 1984 maroon Dodge van with Missouri license plates 541ZFC.

Exiting his police car, but staying behind his vehicle, Officer Templeton made contact with the driver, the defendant, Larry Bridges. Officer Templeton told Mr. Bridges to place his hands on the steering wheel. At first, Mr. Bridges did not place both hands on the steering wheel, and Officer Templeton was unable to see the defendant's left hand. A second time Bridges was told to place both hands on the steering wheel. This time he did so. Mr. Bridges was then ordered out of the vehicle, and he complied. Mr. Bridges was immediately handcuffed. Templeton testified Bridges was handcuffed for the officers' safety. Officer Templeton conducted a pat down search on Mr. Bridges and discovered no item of evidence.

Upon request, the defendant identified himself as Larry Jean Bridges.

The radio dispatch had reported that the suspect had flourished a handgun at the gas station. Officer Templeton immediately asked Mr. Bridges if he had a weapon on his person. Bridges stated, "No." Officer Blackman recalls the defendant saying, "Not on me." Officer Templeton then asked Bridges if he had a weapon in his vehicle. The defendant replied, "Go ahead and look."

Officer Blackman, standing outside the van, immediately saw one round of ammunition sitting on the driver's seat. He then looked under the driver's seat and found a Hi-Point, 9 millimeter semi-automatic handgun. The gun was loaded with a round in the chamber and with a magazine attached. Officer Blackman also found a second loaded magazine and a stun gun under the driver's seat.

The defendant was placed under arrest. Following his arrest, Bridges did not speak, write or comply with any request made by officers. He made no further statements.

The defendant's memorandum attached to his motion to suppress refers to and relies on the police reports of Officers Templeton and Blackman. Neither party introduced the police reports into evidence. The court's findings and conclusions will be based on the testimony adduced at the evidentiary hearing.

## Discussion

An investigatory detention, defined as a brief seizure by police officers, is lawful if

based on reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868, 1879 (1968). A legal investigatory detention requires, on the part of police, a reasonable, articulable suspicion that a person is engaged in criminal activity. Id. The specific and articulable facts required for reasonable suspicion taken together with rational inferences from those facts, justify the intrusion and the court must evaluate the reasonableness of the investigatory detention in light of the particular circumstances surrounding it. 392 U.S. at 21, 88 S.Ct. at 1880. United States v. Walker, 494 F.3d 688, 691 (8th Cir. 2007)(petition for cert. filed (Nov. 2007)). A judge in making that assessment is to use an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." 392 U.S. at 21-22, 88 S.Ct. at 1880. Subjective intentions of police are irrelevant to an evaluation of the constitutionality of a detention under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 811-13, 116 S.Ct. 1769, 1773 (1996).

Did the officers have reasonable, articulable suspicion that the defendant was engaged in criminal activity or, as stated elsewhere, that "criminal activity 'may be afoot?'" United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 752 (2002). The officers received a dispatch from the Police Department that a black man in a maroon van had flourished a handgun at the Rhodes 101 station on Sprigg, the van was northbound on South Sprigg from Rhodes 101 Stop and the license plate on the van started with 54. (Transcript 21). Officers Templeton and Blackman both headed to Sprigg Street anticipating that the van would continue northbound. Within one or two minutes, Officer Blackman told Officer Templeton that Blackman spotted the van on North Sprigg Street but that he, Blackman, was not in a position to stop it. When Templeton, who had been on Broadway, a street which intersects with Sprigg, came to Sprigg, he turned onto Sprigg and saw the van and

turned on his emergency lights. Templeton saw a black man in a maroon van northbound on South Sprigg with his license plate on the van beginning with the numbers 54. When Templeton's police car rounded the corner onto Sprigg from Broadway, Officer Templeton saw Mr. Bridges jerk the steering wheel of the van to the right. The van matched the described van in which a handgun had been flourished. The defendant was a black male and had been proceeding north on South Sprigg. The officers had specific articulable information that criminal activity had taken place. The stop was a valid Terry stop and in accordance with the defendant's constitutional rights.

### **Investigatory Stop or Arrest?**

The Supreme Court has declined to establish a bright-line rule to determine when an investigatory detention becomes an arrest. "... common sense and ordinary human experience must govern over rigid criteria." United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575 (1985). Lower courts decide on a case-by-case basis whether an investigatory detention has become an arrest. In making such decisions, the Eight Circuit held, in United States v. Ruiz, 412 F.3d 871, 879-80 (8th Cir. 2005), that investigatory detention is distinguishable from arrest based on the length of detention, presence of unnecessary delays, and the use of restraints.

In Mr. Bridges's case, the length of detention was very short. Officer Templeton estimated he spent approximately ten minutes in the roadway after stopping the defendant. In neither of the officers' descriptions of what happened were there any lapses of time. Within the estimated ten minutes, Templeton stayed behind his police car shouting to Bridges to put his hands on the steering wheel. At first, the defendant did not comply with the instructions and Templeton had to repeat the order. The defendant's right hand was on the steering wheel and his left hand was down lower. The left hand appeared to be between the seat and the door. Officer Templeton testified that he was

concerned that there was a weapon in the defendant's vehicle as the vehicle matched the description that Templeton had been given possibly one minute prior to the encounter. Templeton waited for Officer Blackman to position himself behind the defendant's vehicle and Blackman initiated contact with the defendant. The defendant was ordered to exit the vehicle and, Templeton testified, "he was handcuffed for officer safety." As he was being handcuffed, the officers asked Bridges his name and if there were any weapons on him. The defendant stated "No." Then Templeton asked if there were any weapons in the vehicle and the defendant responded, "Go ahead and look." It was then that Officer Blackman located a single live bullet in the driver's seat. Blackman then searched the van and found a semi-automatic handgun underneath the driver's seat, fully loaded. There was a magazine or clip in the handgun with one shell missing. The chamber held one shell. There was a second fully loaded magazine and a stun gun found also beneath the driver's seat. <u>Miranda</u> warnings were not read to the defendant. A criminal check was made on the defendant and the officers learned that he had prior felony convictions. All of the foregoing activities took place during the estimated ten minutes the encounter on the street lasted. The court finds the investigatory detention was very brief. After the handgun was found, the defendant was arrested. There were no unnecessary delays in the officers' interaction with the defendant.

The defendant was handcuffed. Did this turn the investigatory encounter into an arrest? In <u>United States v. Dykes</u>, 406 F.3d 717, 720 (2005), the Court of Appeals for the District of Columbia Circuit held:

> Second, once they had brought him to the ground, it was also reasonable for the officers to remove Dykes' hands from underneath his body and to place him in handcuffs. Dykes had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view. Under these circumstances, it was reasonable for the officers to fear that Dykes had a weapon in

his waistband, and to take the necessary steps to ensure that he could not use it. As the Supreme Court said in Terry:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. 392 U.S. at 24, 88 S.Ct. 1868.

The District of Columbia Court of Appeals then referred to its own case, United States v. Laing, 889 F.2d 281, 285 (D.C. Cir. 1989): The "amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight." See also United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006) cert. denied, (noting that the use of handcuffs can be a reasonable precaution during a Terry stop); and United States v. Brown, 2007 WL 4244984 (W.D.Mo. 2007).

The officers had been given dispatch that the subject had been reported to be "flourishing a handgun" at the Rhodes 101 gas station. The word flourishing could imply reckless movement of the firearm about, which would be a danger to whoever was at the Rhodes 101. If the subject in the van after it was stopped did have a handgun, being in the middle of traffic, could present even more danger to the public and to the officers. At first, when the defendant was asked to place both hands on the steering wheel, he failed to place one of the hands on the steering wheel and instead kept it below the sight line of Templeton where it could have been holding the firearm. On the second time the command was given, the defendant did place his second hand on the steering wheel. Officer Templeton's concern for his safety was demonstrated by the fact that he kept his own police car between himself and the defendant when waiting for the defendant to put his hands on the steering

wheel and then to exit the vehicle. Even once the defendant exited the vehicle, while talking to officers, the defendant could have made a rush back to the door of his van and obtained the weapon left there. The officers were exercising reasonable caution in placing Mr. Bridges in handcuffs, both for their own safety and that of the community. The court finds that the act of handcuffing the defendant for the safety of the officers and the public did not change the investigatory stop into an arrest of the defendant. Other cases in which handcuffing the defendant did not result in the defendant's arrest are United States v. Marxen, 410 F.3d 326, 332 (6th Cir. 2005); United States v. Stewart, 388 F.3d 1079, 1084-85 (7th Cir. 2004); and United States v. Carter, 360 F.3d 1235, 1240 (10th Cir. 2004).

## The Arrest

When asked if being a felon in possession of a firearm is a violation of Missouri law, Officer Templeton stated that he ran a criminal background check while the officers were on the roadway and found Mr. Bridges had been convicted of a felony within the previous five years. Templeton testified that under Missouri law, if an individual possesses a firearm after having received a conviction for a felony within the previous five years, he violates the law. (Transcript 31).

The statute Officer Templeton probably was referring to is § 571.070. Possession of Concealable Firearm Unlawful for Certain Persons–Penalty. That statute makes the possession of a concealable firearm by a felon unlawful if he has pled guilty to or has been convicted of a dangerous felony as defined in § 556.061 RSMO within the prior five years. In point of fact, in 2000 the defendant was convicted of a dangerous felony, Aggravated Criminal Sexual Abuse. However, within the past five years of September 2, 2007, the defendant was convicted of the felony of Failure to Register Change of Address by Sex Offender, which is not a dangerous felony as defined in § 556.061.

On the other hand, the defendant was described in the dispatch as flourishing a handgun. Section 571.030. Unlawful Use of Weapons–exceptions–penalties provides: "1. A person commits the crime of unlawful use of a weapon if he or she knowingly: (4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner;" The court sees little difference between a person who "flourishes a weapon" and one who "exhibits a weapon in a threatening manner." According to Merriam Webster's Ninth New Collegiate Dictionary, at 475, the third definition of flourish is given as "to make bold and sweeping gestures–v.t.: to wield with dramatic gestures; brandish."

In addition, one of the other offenses listed under the crime of unlawful use of a weapon is committed if an individual "Carries concealed upon or about his or her person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use;" § 571.030.1.(1). Just recently (2003), the Missouri legislature created an exception to the crime of carrying a concealed weapon for the possession in an automobile for a person 21 years of age transporting a concealable firearm in the passenger compartment of a motor vehicle "so long as such concealable firearm is otherwise lawfully possessed...." § 571.030.3. The defendant does not qualify for this exception because possession of a firearm by a convicted felon, although not necessarily a Missouri crime, is a federal crime and, consequently, the exception which requires that the firearm be "otherwise lawfully possessed" in the passenger compartment of an automobile does not apply to the defendant in the factual situation on September 2, 2007. Defendant Bridges was properly arrested and later charged by the prosecuting attorney with Unlawful Use of a Weapon.

### Defendant's Statements

It is clear that no Miranda warnings were given. Officer Templeton stated:

> We asked him – the two questions that we asked him, if there were any weapons on him and when he stated "no," we asked if there was any in the vehicle and he stated "go ahead and look" and that was the only questions he'd answered.

(Transcript 13-14).

Did the questions asked by the officers and the answers given by the defendant violate the defendant's rights under Miranda? The government, in its Response to Defendant's Motion to Suppress, sets out a thorough and apposite explanation of the public safety exception to the Miranda rule. The United States Supreme Court, in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626 (1984), created the exception. In that case, a young woman approached two officers in Queens, New York, and told the officers that she had just been raped by a man and she described him, his height, what he was wearing and told the officers that the man had just entered a supermarket located nearby and that the man was carrying a gun. One officer then radioed for backup and the other officer went into the supermarket. He spotted the subject, who matched the description given by the woman, approaching a checkout counter. When he saw the officer, the subject turned and ran toward the rear of the store, and the officer pursued him with a drawn gun. The subject turned the corner at the end of an aisle and the police officer lost sight of him for several seconds. When he caught sight of him again, the officer ordered the subject to stop and put his hands over his head. The officer frisked the subject and discovered that the man was wearing a shoulder holster which was empty. After handcuffing him, the officer asked where the gun was. The subject nodded in the direction of some empty cartons and stated, "The gun is over there." The officer then retrieved a loaded .38 caliber revolver from one of the cartons and formally placed the man under arrest and read him his Miranda rights from a printed card.

In the subsequent prosecution of the case, the trial judge excluded the statement, "The gun is over there" because the officer had not given the defendant the warnings required by Miranda before asking him where the gun was located. The Appellate Division of the Supreme Court of New York affirmed. The decision by the Supreme Court (a lower court in New York) was affirmed by the Court of Appeals. The United States Supreme Court found that the case presented a situation "where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda." 467 U.S. at 653, 104 S.Ct. at 2630. The Supreme Court reversed the Court of Appeals and held that there is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence and that the availability of the exception does not depend upon the motivation of the individual officers involved." Id. at 655-656. The Court found that whatever the motivation of individual officers were in such a situation, the Court did not believe that the doctrinal underpinnings of Miranda required that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. Id. at 656, 104 S.Ct. at 2631-2632. The government's memorandum refers to United States v. Williams, 181 F.3d 945 (8th Cir. 1999), in which the Eighth Circuit found that asking the defendant without giving Miranda warnings "Is there anything we need to be aware of?" and the defendant answering that a gun was in the closet did not violate the requirements of Miranda. The Eighth Circuit found that the question without Miranda warnings was permissible as long as the question was reasonably prompted by a concern for public safety. 181 F.3d at 953-954.

Larry Bridges's statements that he had no firearm on his person and in response to Templeton's question, whether there was a weapon in defendant's vehicle, replying "Go ahead and look," come within the exception. These statements should not be suppressed. As the government

points out in its memorandum, the Eighth Circuit's opinion in United States v. Antwine, 873 F.2d 1144 (8th Cir. 1989), recognizes that the Supreme Court's holding in Quarles was consistent with the long recognized exigent circumstances exception to the search warrant requirement. See Quarles, 467 U.S. at 653 n. 3. The Antwine court referred to its own "long-held view that legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches. 873 F.2d at 1146-47.

**Voluntariness of Consent to Search**

In his memorandum, the defendant stated that "The government must show by a preponderance of the evidence that a consent was voluntarily obtained." (citation omitted)

The government, in its Response to the Defendant's Motion to Suppress, referred to the factors listed in United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990), as a proper measure to assess the voluntariness of a consent to search. The Chaidez court provides for an examination of five characteristics of the person giving the consent to be considered by the court: the defendant's age; his general intelligence and education; whether the defendant was intoxicated or under the influence of drugs when consenting; whether the consent was given after being informed of a right to withhold the consent or of the Miranda rights; whether because of previous arrests the defendant was aware of the protection afforded to a suspected criminal by the legal system.

The defendant was 42 years old on September 2, 2007, certainly an age when he is considered responsible for his actions.

The defendant, after being arrested, did not answer any other questions. He was described as staring straight ahead. Officer Templeton stated that, during the time when the defendant was transported to the Cape Girardeau Police Department, approximately a block and a half from the

location of the stop, booked, processed, fingerprinted and photographed–during that whole process–the defendant did not speak except to give his name when asked. When he was offered an opportunity to sign a Miranda waiver, the defendant looked straight ahead and would not acknowledge anything the officers said. The defendant appeared to understand well his rights under the legal system.

Officer Templeton testified that the defendant appeared to have average intelligence. Templeton stated that the defendant did not appear to be under the influence of alcohol or drugs and did appear to be driving the vehicle in a controlled fashion. When interviewed by the Pretrial Services Officer in November of 2007, the defendant stated he had not used cocaine in ten years nor marijuana in five years.

One of the areas of inquiry under Chaidez is whether consent to search was given after the suspect was informed of a right to withhold the consent or of the Miranda rights. The defendant was not given Miranda rights as has been stated earlier, nor was he informed of his right to withhold consent to search. The officers did not request consent to search the defendant's vehicle. Templeton asked if there were any weapons in the vehicle. The defendant responded, "Go ahead and look," giving consent without formally being asked.

With respect to the defendant's familiarity with the legal system and the rights provided by that system to a suspect, the indictment itself lists two felony convictions: that on September 5, 2000, in the Circuit Court of Kankakee County, Illinois, for Aggravated Criminal Sexual Abuse, and on March 18, 2003, in Kankakee County, Illinois, the offense of Failure to Register Change of Address by Sex Offender.

The Chaidez court also states that a court considering whether a consent to search was or was

-13-

not voluntary should consider the environment in which the consent was given: Was the defendant detained and questioned for a long or short period of time? Was the defendant threatened, physically intimidated, or punished by the police? Had the defendant relied upon promises or misrepresentations made by the police? Was the defendant in custody or under arrest when consent was given? Was the defendant in a public or a secluded place? Did the defendant either object to the search or stand by silently when the search occurred?

With respect to the environment, the defendant was detained a very short period of time, less than ten minutes, and he was asked, besides what his name was, two questions, whether he had a gun on his person and whether there was a firearm in his vehicle.

The evidence was that the defendant was not threatened, physically intimidated or punished by the police. There were no promises or misrepresentations made by the police in order to obtain the defendant's consent. When the consent was given, the defendant was not under arrest, though he was detained. The defendant was in a very public place when he was arrested, the intersection of two streets, which accounted for part of the concern of officers for the public's safety. One of the concerns mentioned was the proximity of a Subway restaurant at the corner of Broadway and Sprigg, where customers were likely to be present. The evidence was that the defendant did not object to the search but instead stood by silently while the search occurred.

The court finds that the consent to search by the defendant when he said "Go ahead and look" was voluntary and given without any coercion on the part of the police. The defendant's statements are admissible and should be introduced into evidence.

### The Search of the Defendant's Van

A search based upon consent of the defendant without a warrant or other probable cause is

valid if voluntary, based upon the totality of the circumstances surrounding the consent. Schneckloth v. Bustamonte, 412 U.S. 218 at 227 (1973); United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

The court having found that the defendant's consent to search his vehicle had been given voluntarily, the court finds that the bullet on the driver's seat in the van, the firearm found under the driver's seat with magazine attached along with the additional fully loaded magazine of ammunition and the stun gun were all properly seized and should be admitted into evidence.

In response to the general allegations in defendant's motion to suppress (set out in the motion to suppress, p. 1; and in this report and recommendation, p.1), the court finds:

1. The evidence seized was not obtained in violation of defendant's rights under the Fourth Amendment, was obtained in accordance with defendant's rights and is admissible in evidence.

2. Statements made by the defendant were not the product of an unlawful seizure, were voluntary and were taken under an exception to the requirements of Miranda.

**IT IS, THEREFORE, RECOMMENDED** that the defendant's Motion to Suppress Evidence Obtained in Search or Seizure and Statements of the Defendant (Document #23) should be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
United States Magistrate Judge

Dated this 19th day of March, 2008.